**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: February 02, 2017.**



_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NEXTSTEP DEVELOPMENT, INC. | § | CASE NO.  16-52019 |
| | § | |
| BANDERA POINTE HOSPITALITY, LP. | § | CASE NO.  16-52021 |
| | § | |
| Jointly Administered Debtors | § | CHAPTER 11 PROCEEDING |
| | § | (Jointly Administered Under |
| | § |  16-52019) |

**ORDER RELATING TO DEBTOR NEXTSTEP DEVELOPMENT, INC.'S MOTION (A) FOR AUTHORITY TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) TO ESTABLISH PROCEDURES WITH RESPECT TO SUCH SALE AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES; AND (C) TO CONSIDER APPROVAL OF BREAK UP FEE AND (D) TO SHORTEN AND LIMIT NOTICE**

On December 6, 2016, Nextstep Development, Inc. ("Nextstep" or the "Debtor") filed its Motion (A) for Authority to Sell Assets Free and Clear of Liens, Claims, and Encumbrances; (B) to Establish Procedures with Respect to Such Sale and the Assumption and Assignment of Executory Contracts and Leases; (C) to Consider Approval of Breakup Fee; and (D) to Shorten Notice (the "Sale Motion").    In the Sale Motion, the Debtor seek authority for the Debtor to sell certain of Nextstep's assets (the "Identified Assets") pursuant to an Asset Purchase Agreement (the "Agreement") with Paresh A. Patel and Nima P. Patel or their assigns (collectively, the

"Purchaser"), a copy of which is attached to the Sale Motion as Exhibit "A". Unless otherwise defined in this Order, capitalized terms used herein shall have the meanings ascribed to them in the Agreement. On December 12th, 2016, a hearing (the "Procedures Hearing") was held to consider the Debtor's request in the Sale Motion for entry of an order approving proposed bid procedures and bidder protections and scheduling a deadline for filing objections to the Sale Motion and a hearing to consider the Sale Motion and any timely filed objections. Following the Procedures Hearing, on December 14th, 2016, the Court entered an Order (A) Establishing Bidding and Other Procedures in Connection with the Sale of Debtor' Assets of the Debtor, (B) Granting Protections to Proposed Buyer and (C) Providing Notice of Hearing on Sale Motion to (1) Approve Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (2) Authorize Assumption and Assignment of Executory Contracts and Unexpired Leases; (3) Establish Cure Amounts Therefor; and (4) Approve Other Related Relief (the "Procedures Order"). In accordance with the requirements of the Procedures Order, creditors and parties in interest were given notice of the procedures and deadline (the "Bid Deadline") for submitting offers for the purchase of any or all of the Identified Assets, and an Auction Sale was scheduled for the Identified Assets at which Eligible Bidders would be permitted to participate.

In addition, the Motion to Sell provided notice to parties to executory contracts that will be assigned (the "Assigned Contracts" as that term is defined in the Agreement) that the Debtor did not believe that any sums were due and owing and necessary to cure any defaults under the Assigned Contracts ("Cure Costs"). Creditors and parties in interest were also given notice of (a) the hearing scheduled for December 16th, 2016 at 9:00 a.m. (the "Sale Hearing") to consider approval of the sale of some or all of the Identified Assets and assumption and assignment of the Assigned Contracts to the Purchaser or any other Eligible Bidder submitting an offer at or before the Auction Sale which the Debtor proposes to accept as the highest and best offers, and (b) the deadline of December 15th, 2016 to file objections to the Sale Motion. Pursuant to the Procedures Order, an Auction Sale with two competing bidders was conducted by the Court on December 16th, 2016. At the Auction Sale, the highest and best offer was submitted by Paresh A. Patel and Nima B. Patel or their assigns (collectively, the "Purchaser") for a total cash purchase price of $3,150,000.00 on terms and conditions as set forth in the Agreement between the Purchaser

and the Debtor attached to the Motion to Sell and as modified herein and set forth in the First Amendment to Contract that is part of Exhibit "A" (the "Agreement"). Alan Gopal, M.J. Patel and Vinod Patel (collectively, the "Backup Bidder") agreed to purchase the Identified Assets for $3,125,000.00 in the event that Purchaser terminates the Agreement pursuant to its terms or fails to timely consummate the purchase. Furthermore, Weinritter Realty, LP, pursuant to the provisions of Section 363(k) of the Bankruptcy Code, agreed to purchase the Identified Assets for $2,800,000.00 in the event that Purchaser and the Backup Bidder fail to timely purchase the Identified Assets.

Unless otherwise defined in this Order, capitalized terms used herein shall have the same meanings ascribed to them in the Agreement and the Sale Motion.

No objections or responses to the Sale Motion were timely filed. The Court having reviewed the Sale Motion and the record in this case, and having considered argument of counsel and evidence presented at the Sale Hearing and it appearing that the Sale Motion is in the best interest of the Debtor and its estate, for good cause shown, and for the reasons stated by the Court on the record at the Sale Hearing, which are incorporated herein by reference, the Court finds as follows:

A. The Debtor has continued in possession of its property and is operating its business as a Debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B. This Court has jurisdiction over this matter and the parties and property affected thereby, pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 363 and 365. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N) an (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. Due and adequate notice of the filing of the Sale Motion and the Sale Hearing was given by service of the Sale Motion and notice of the Procedures Hearing.

D. Based upon a review of its books and records, the Debtor set forth in the Sale Motion that it believed that were no amounts due and owing to any cure defaults under the Assigned Contracts pursuant to Section 365(b) of the Bankruptcy Code other than $45,231.04 being due and owing to Choice Hotels International. The Debtor requested in the Sale Motion, and the Procedures Order so required, that, unless an objection to the proposed Cure Costs was properly and timely filed and served by a non-debtor party to an Assigned Contract, the Court

enter an order determining that there are no Cure Costs due and owing under Section 365(b) of the Bankruptcy Code and that no payment is necessary to cure any and all defaults other than a payment to Choice Hotels International (if that contract is ultimately assumed and assigned).

E.     The Debtor has established that there are sufficient business justifications to authorize the sale of the Identified Assets and the assumption and assignment of the Assigned Contracts prior to or after confirmation of a Chapter 11 plan.

F.     The terms of the Agreement, as modified herein, are fair and reasonable and the transactions contemplated thereunder reflect the Debtor's prudent business judgment under all of the relevant circumstances and will result in the highest possible sales price for the Debtor's estate and creditors thereof. The proposed transactions contemplated in the Agreement, as modified herein, are in the best interests of the Debtor, creditors and interested parties.

G.     The Debtor has good title to the Identified Assets. The Debtor and the Purchaser are not affiliates of one another within the meaning of §101(2) of the Bankruptcy Code. The Purchaser, as transferee of the Identified Assets, constitutes a good faith purchaser under the Uniform Commercial Code and Section 363 of the Bankruptcy Code, and the Purchaser is entitled to all of the protections of Section 363(m) of the Bankruptcy Code afforded to a good faith purchaser. Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided under §363(n) of the Bankruptcy Code.

H.     In accordance with Section 365 of the Bankruptcy Code, the Court finds adequate assurance of future performance of each of the Assigned Contracts by the Purchaser with respect to all non-debtor parties under the Assigned Contracts.

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

1.     The Sale Motion is granted, as set forth herein.

2.     The Agreement, as modified herein, is approved in all respects, and the Debtor is authorized to sell the Identified Assets and, if it so desires, to assume and assign the Assigned Contracts to the Purchaser, on terms and conditions substantially in accordance with those set forth in the Agreement. The terms and provisions of the Agreement, as modified herein, are hereby approved as if fully set forth and incorporated herein; provided, however, that the terms and conditions of this Order shall control in the event of any conflict with the terms and

conditions of the Agreement Specifically, the Agreement is modified as follows:

(a) Section 1.3 of the Agreement titled "Purchase Price" shall be deleted in its entirety and replaced with the following:

*"1.3 Purchase Price*

*The purchase price for the Property shall be Three Million One Hundred Fifty Thousand and No/100 Dollars ($3,150,000.00) (the "Purchase Price")."*

(b) Section paragraph 3.2 of the Contract is hereby deleted in its entirety and replaced with the following paragraph:

**"3.2 Right of Inspection**

*Purchaser shall have the right, for a period commencing on the Effective Date, and terminating on February 3, 2017 (the "Inspection Period"), to enter the Property and make a physical inspection of the Property (including, without limitation, the taking of core samples and other intrusive testing) and to examine all books and records maintained by Seller relating to the Property at such place or places as such books and records may be located in Bexar County, Texas; provided, however, that Purchaser agrees to (a) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense resulting from the negligence or willful misconduct of Purchaser, its agents, employees or contractors during such inspection and examination, and (b) repair any and all physical damage done to the Property by Purchaser, its agents, employees or contractors during such inspection and examination. All inspections shall be conducted so as not to unreasonably interfere with use of the Property by Seller. Purchaser and Seller acknowledge and agree that, in addition to the Earnest Money, Purchaser has deposited the Inspection Period Fee with the Title Company as provided in Section 1.5 of this Agreement as additional consideration to Seller for the Inspection Period provided herein. Purchaser and Seller further acknowledge and agree that (a) if Purchaser exercises its right to terminate this Agreement pursuant to Purchaser's right of termination set forth in Section 3.4 of this Agreement, then the Title Company shall deliver the Inspection Period Fee to Seller upon such termination of this Agreement, (b) in all other events in which Purchaser is entitled to terminate this Agreement, including, without limitation, in the event of Seller's default hereunder, the Inspection Period Fee shall be returned to Purchaser in the same manner in which the Earnest Money, less the Independent Contract Consideration, is returned to Purchaser in such events, (c) in all events in which Seller is entitled to terminate this Agreement, the Inspection Period Fee shall be delivered to Seller in the same manner in which the Earnest Money is delivered to Seller in such events, and (d) if this Agreement proceeds to Closing, the Inspection Period Fee shall be applied to the Purchase Price.*

*Purchaser will, at its sole cost and expense, on or before December 23rd, 2016, make application for and obtain approval during the Inspection Period, to operate the property as an Econolodge hotel pursuant to an agreement with CHOICE HOTELS INTERNATIONAL ("Franchisor") thereof ("Franchise Approval"). Purchaser shall use its good faith efforts to obtain franchise approval and will at all times keep Seller appraised of its efforts to obtain*

*franchise approval and respond promptly to all inquiries of Seller in this regard, supplying such information as Seller may reasonably request. Purchaser hereby agrees to diligently and timely execute all documents and pay all transfer fees and expenses required in connection with obtaining franchise approval and the continued operation of the Property as contemplated thereby pursuant to a franchise agreement with standards and provisions as are customary for franchise transfer of an Econonlodge hotel, which may be more or less favorable to Purchaser than the Franchise Agreement is with respect to the Seller. Seller agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining franchise approval. If Purchaser does not obtain franchise approval or disapproves the terms that will be imposed by Franchisor during the Inspection Period, this contract is considered null and void, and the Earnest Money less the non-refundable portion of the Earnest Money, the Inspection Period Fee and Independent Contract Consideration will be returned to the Purchaser by the Title Company."*

.       (c) The first sentence of Section 5.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

*"The Closing shall take place on or before February 15, 2017; provided that Buyer shall retain the right to extend the closing for 30 days by paying the Extension Fee as provided in Section 5.1 of the Contract."*

4.       The Debtor's sale of the Identified Assets to the Purchaser in accordance with this Order and the Agreement, pursuant to Section 363 of the Bankruptcy Code, shall be free and clear of any and all liens, claims, encumbrances, and other interests, with any and all such liens, claims, encumbrances, and other interests attaching to the net proceeds of the sale in the same validity and in the same order of priority as in the underlying Identified Assets.  The claims, liens, encumbrances, and other interests, if any, asserted by any person or entity in or to any of the purchase price proceeds shall be in the same priority and subject to the same infirmities and defenses as existed with respect to the claims, liens, encumbrances, and other interests in the property prior to the sale.

The ad valorem tax lien for 2016 pertaining to the Identified Assets shall attach to the sales proceeds and the title company shall pay all ad valorem tax debt owed incident to the Identified Assets immediately upon closing and prior to any disbursement of proceeds to any other person or entity.

The ad valorem taxes for year 2017 pertaining to the Identified Assets shall be prorated in accordance with the Agreement and shall become the responsibility of the Purchaser and the year 2017 ad valorem tax lien shall be retained against the subject property until said taxes are paid in full.

5.      Notwithstanding anything to the contrary in this Order, the Debtor is authorized, through the title company consummating the sale, to pay or satisfy at the Closing: (a) all allowed ad valorem taxes for 2016; (b) the real estate commission due and owing to Marcus & Milichap (c) the allowed claim of Weinritter Realty, LP. and (d) if authorized by the Debtor, the Cure Cost due and owing to Choice Hotels International under the Assumed Contract.

6.      The Debtor is authorized to: (a) perform and consummate the transactions contemplated by the Agreement, (b) to execute and deliver all documents and instruments thereby required and (c) transfer to the Purchaser all right, title, and interest in and to the Identified Assets.

7.      Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rule 7070 and Fed. R. Civ. Pro. 70, this Order shall and does, as of the Closing Date and the payment of the consideration described in the Agreement, divest the Debtor and its estate of all right, title, and interest in the Identified Assets and vest good, valid and marketable title in and to the Identified Assets in the Purchaser, free and clear of any and all liens, mortgages, security interests, pledges, hypothecations, encumbrances, restrictions, reservations, encroachments, infringements, easements, conditional sale agreements, title retention or other security arrangements, defects of title, adverse rights or interests, charges or claims of any nature whatsoever.

8.      If any person or entity that has filed financing statements or other documents or agreements evidencing liens on or interests in the Identified Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens or other interests which the person or entity has with respect to the Identified Assets, all liens or interests identified in any financing statements, agreements or other documents shall be deemed released, terminated and satisfied, and this Order is and shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or inure any title or state of title in or to any of the Identified Assets.

9.      The Debtor is authorized, but not obligated, to assume the Assigned Contracts and assign said Assigned Contracts to the Purchaser, in accordance with Section 365 of the Bankruptcy Code, effective only upon Closing the transactions contemplated under the Agreement.

10.     In the event the Closing does not occur on or before the Closing Date (as defined in the Agreement), the Debtor shall not have any obligation to assume any Assigned Contract and the Assigned Contracts shall not be considered to have been assumed by the Debtor pursuant to Section 365 of the Bankruptcy Code.

11.     Upon assignment of each of the Assigned Contracts to the Purchaser on the Closing Date, the Debtor and its estate shall be relieved, pursuant to 11 U.S.C. §365(k), from any liability for any breach of the Assigned Contracts occurring after such assignment, including the payment of any rent, taxes, overpayments, maintenance charges or any other amounts. Furthermore, no Cure Costs are due and owing under the Assigned Contracts and; therefore, Debtor and the Purchaser do not and shall not have any further obligation or liability whatsoever under the Assigned Contracts that relate to services provided by Debtor prior to the Closing Date or that relate to the applicable Assigned Contracts. Each non-Debtor party to an Assigned Contract is hereby barred and enjoined: (a) from asserting against the Debtor or the Purchaser any default existing as of the date of the Sale Hearing since such default was not raised or asserted prior to the Sale Hearing, and (b) from asserting any other objection to the assumption and assignment of such Assigned Contracts.

12.     Because the Purchaser has acted in good faith, pursuant to Section 363(m) of the Bankruptcy Code, the reversal or modification of this Order on appeal will not affect the validity of the transfer of the Identified Assets (including the assumption and assignment of the Assigned Contracts, if any) to the Purchaser or any other transactions contemplated by the Agreement and/or authorized by this Order, unless the same is stayed pending appeal prior to closing under the Agreement.

13.     If for any reason the Purchaser fails to timely consummate the acquisition of the Identified Assets in accordance with Agreement and this order, the Debtor is authorized to consummate the sale of the Identified Assets to the Backup Bidder pursuant to the provisions of the

Agreement for $3,125,000.00 without further order of the Bankruptcy Court. For purposes of this order and this section 13, the Backup Bidder will be then considered "Purchaser".

14.     If for any reason the Purchaser and the Backup Bidder fail to timely consummate the acquisition of the Identified Assets in accordance with Agreement and this order, the Debtor is authorized to consummate the sale of the Identified Assets to Weinritter Realty, LP, the Debtor's secured creditor, for $2,800,000.00 in the form of a credit against its debt pursuant to the provisions of Section 363(k) of the Bankruptcy Code, the Agreement and this order. For purposes of this order and this section 14, Weinritter Realty, LP will be then considered "Purchaser".

15.     In the event Purchaser fails to consummate the purchase of the Identified Assets and the Backup Bidder or Weinritter Realty, LP purchase the Identified Assets, Purchaser shall not be entitled to receive the "breakup fee" approved in the Procedures Order.

16.     The Court has jurisdiction under 28 U.S.C §§157 and 1334 and 11 U.S.C. §§§105, 363, and 506 to determine the matters addressed herein as core proceedings under 28 U.S.C. §157(b). This Court shall retain jurisdiction over any issues relating to the Agreement and to enforce its Order pursuant to 11 U.S.C. §105 and Bankruptcy Rule 7070. Any suit, action, proceeding, claim or dispute under or related to this Order, the Assigned Contracts, the assumption or assignment of the Assigned Contracts, the non-existence of cure costs due and owing under the Assigned Contracts, the adequate assurance of future performance under the Assigned Contracts, the disposition of purchase price proceeds, or any order necessary to consummate the sale and assignment transactions shall be determined by this Court as a core proceeding under 11 U.S.C. § 157(b) and this Court retains jurisdiction with respect thereto.

17.     This is a final order and is enforceable upon entry by the Clerk of the Court. To the extent necessary under the Federal Rules of Bankruptcy Procedure 5003, 9014, 9021 and 9002, this Court expressly finds that there is no just reason for delay in this implementation of this Order and expressly directs entry of judgment as set forth herein and the stays of Federal Rules of Bankruptcy Procedure Rules 6004(h) and 6006(d) are hereby waived, modified and shall not apply to the sale of the Identified Assets and the assumption and assignment, if any, of the Assigned Contracts in accordance with the Agreement, and the Debtor are authorized to take all actions and enter into all transactions authorized by this Order immediately. In connection with the foregoing, the Debtor, the Purchaser and the title company assisting with the consummation of the sale are authorized to close this transaction immediately upon entry of this

order and is not required to wait fourteen (14) days before closing the sale and assignment contemplated herein.

18. The sale does not and will not subject or expose the Purchaser, its successors or assigns, to any liability, claim, cause of action or remedy by reason of such sale and transfer, including, without limitation, any claim, cause of action or remedy based on any theory of successor or transferee liability and that Purchaser shall not assume any liability or obligation of the Seller, fixed or contingent, disclosed or undisclosed, or any liability for any claims, debts, defaults, duties, obligations or liabilities of Debtor of any kind or nature, whether known or unknown, contingent or fixed, all of which, to the extent that they existed prior to the Closing Date, are retained by the Debtor (the "Retained Liabilities").

19. Each and every federal, state and local government agency or department, and all parties to the personal property leases being assumed and assigned hereby are directed to accept (and file, if appropriate) any and all documents and instruments necessary to consummate the transactions contemplated by the Agreement.

20. This Court retains exclusive jurisdiction to resolve any dispute arising from or related to the Agreement. The Court specifically retains jurisdiction over the assets and the executory contracts that are the subject of the Sale Motion, to the extent that the sale is not closed as a result of the inability to satisfy the conditions precedent to Closing as described in the Agreement.

21. Pursuant to Federal Rule of Civil Procedure 52, the Court's findings of fact stated orally and reported in open court are hereby incorporated herein by reference, the same as if fully copied and set forth at length.

# # #

**Submitted by**:
William B. Kingman, SBN 11476200
Law Offices of William B. Kingman, PC
4040 Broadway, Suite 350
San Antonio, TX 78209
(210) 829-1199/Fax: (210) 821-1114
bkingman@kingmanlaw.com
*Counsel for Debtors*

AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "<u>Agreement</u>") is made to be effective as of the date described in Section 10.23 hereof (the "<u>Effective Date</u>"), by and between NEXTSTEP DEVELOPMENT INC.., a Texas corporation ("<u>Seller</u>"), and Paresh A. Patel and Nima P. Patel (collectively "<u>Purchaser</u>").

ARTICLE I<br>PURCHASE AND SALE

1.1     <u>Agreement of Purchase and Sale.</u>

(a)     Subject to the terms and conditions set forth herein and for the consideration stated herein, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller: (a) that certain real property known as Econolodge Downtown South, located in San Antonio, Bexar County, Texas and more particularly described in Exhibit A attached hereto and incorporated into this Agreement by reference (the "Real Property"); together with any and all improvements and buildings situated thereon, together with all rights, tenements, hereditaments, easements, appendages, privileges and appurtenances pertaining thereto, including all sewer and wastewater discharge capacity allocated or reserved thereto, all potable water capacity allocated or reserved thereto, all other utility rights allocated or reserved thereto, all development rights with respect thereto, any right, title and interest of Seller in and to the adjacent streets, alleys, rights-of-way and any adjacent strips or gores of real estate and any right, title and interest of Seller in and to all rights, royalties and profits in connection with all minerals, oil and gas and other hydrocarbon substances on or in the Property, (b) all the trade fixtures, furnishings, and equipment, machinery, supplies and other articles of tangible personal property owned by Seller and located in, attached to or used in connection with the management, operation, repair and/or maintenance of the Real Property (collectively, the "Personal Property"), (c) all intangible property now or on the Closing Date owned or held by Seller or its affiliates or in which Seller or its affiliates have rights and used in connection with the Land, Improvements and/or Personal Property, including, without limitation, (i) all leases and service contracts (the "Leases and Service Contracts") (ii) all transferable licenses, permits, authorizations, approvals, entitlements, and certificates of occupancy (collectively, the "Permits"), and (iii) all right, title and interest of Seller in all transferable warranties (if any), telephone numbers, websites, domain names, plans and specifications, trade names, operating-materials, service marks, logos, and goodwill owned by Seller and related to the Property, or any part thereof including, without limitation, the name "Econolodge Downtown South"); the internet domain name any related domain names and all Facebook accounts, Twitter accounts and similar social media with respect to the Property (collectively, with the Leases and Service Contracts and Permits, the "Intangible Property"). The Real Property, Personal Property and Intangible Property being hereinafter sometimes referred to collectively as the "Property"). The Property shall include other intangible rights, titles, interests, privileges and appurtenances of every kind and description appurtenant to or benefitting the Real Property.

<br><br>

**EXHIBIT A**

(b)     Notwithstanding anything to the contrary contained in this Agreement, Purchaser and Seller hereby acknowledge and agree as follows:

(i)     Seller, as the "Debtor" in the bankruptcy case styled, *In re: Nextstep Development Inc,*., assigned case number 16-52019 (the "Bankruptcy Case"), and now pending before the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Court"), shall make an application (the "Application") to the Court in the Bankruptcy Case for approval of the transaction contemplated by this Agreement within three (3) business days after the Effective Date and shall seek an expedited hearing of the Application. The Application shall seek such approval with respect to the Property free and clear of any interest in the Property, including any and all liens, leases, claims or other encumbrances pursuant to 11 U.S.C. § 363. This Agreement shall be valid only if the Court approves of, and approves by its Order, the provisions set forth below. The Application and the Court's Order Approving the Sale of the Property to Purchaser shall be subject to approval by Purchaser. Debtor, as Seller, understands and agrees that time is of the essence regarding all provisions set forth in Section 1.1(b) of this Agreement.

(ii)     Bid Protections and Break-up Fee. The Debtor hereby is authorized to: (a) accept the offer by Purchaser subject to higher and better offers as set forth in the Application and (b) request the Court provide to Purchaser Bid Protections and a break-up fee in the amount of $50,000.00 (the "Break-up Fee") as reimbursement for any and all expenses incurred or to be incurred by Purchaser as a result of this transaction, including but not limited to, those for attorney's fees, due diligence, in-house resources and other expenses, subject to the terms and conditions set forth herein. The Break-up Fee shall be fixed at the amount stated in the immediately preceding sentence regardless of whether Purchaser's actual expenses exceed or are less than such amount. Upon Court approval, the Break-up Fee allowed and approved shall constitute an administrative expense claim against the Debtor pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code. The Break-up Fee allowed and approved shall be paid, if at all, upon the date of consummation of any transaction proposed by a successful bidder, if the successful bidder is not Purchaser, and such payment shall be made from the proceeds of such transaction. The attendance and/or participation by Purchaser at any hearing concerning the sale of the Property that is the subject of the Agreement shall not be construed as a waiver or release of Purchaser's right to receive the Break-up Fee hereby allowed and approved.

(iii)     Further, any Application filed by the Seller as Debtor in the Bankruptcy Case, and any Order approving the sale of the Property that is the subject of this Agreement shall contain the following provisions as requested findings, findings, requested decretal paragraphs and/or decretal paragraphs, together with such other provisions as Seller may require:

1.     Pursuant to 11 U.S.C. § 363(b) and 11 U.S.C. § 365, the sale of the Property contemplated by the Agreement to Purchaser, is free and clear of all interests and encumbrances and the transactions contemplated thereby are approved in all respects.

2. Except as otherwise specifically provided in the Agreement, the Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or its business or assets or any obligations of or claims against the Debtor arising at any time, including, but not limited to, liabilities on account of any taxes (subject to Section 5.4 of this Agreement) arising, accruing, or payable under, out of, in connection with, or in any way relating to the Property prior to the Closing date, including but not limited to hotel occupancy taxes.

3. The transactions contemplated by the Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale shall not affect the validity of the Sale to the Purchaser. Furthermore, the stay provided by the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) shall not apply to this Order and that, therefore, the sale of assets approved and authorized by this Order may proceed to closing and consummation instanter.

4. As a good faith purchaser of the Property, the Purchaser has not colluded with any of the other bidders, potential bidders or any other parties interested in the Property, and therefore neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against the Purchaser, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

5. <u>Sale and Transfer of Property</u>.

(A) Pursuant to 11 U.S.C. § 363(b) and 11 U.S.C. § 365, the Debtor hereby is authorized to sell the Property to Purchaser and consummate the this sale in accordance with and subject to the terms and conditions of the Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Agreement, and further is authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, including without limitation the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to Purchaser or reducing to possession, the Property, or as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Agreement.

(B)     Pursuant to 11 U.S.C. § 363 (b) and 363(f), the Property shall be transferred to the Purchaser upon consummation of the Agreement (the "Closing Date") free and clear of all interests and encumbrances (including any leases concerning the property that is the subject of the Agreement) of any kind or nature whatsoever including, but not limited to, interests or encumbrances in respect of the following: (i) any labor agreements; (ii) all mortgages, deeds of trust and security interests; (iii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (iv) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (v) any bulk sales or similar law; (vi) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (vii) any theories of successor or products liability; and (viii) any Environmental Health and Safety Laws (as defined in the Agreement). For purposes of clarification, any employee medical claims which are incurred prior to the Closing (regardless of when such claims are presented for payment) shall be claims against the bankruptcy estates of the Debtor, and not the Purchaser, and the Purchaser shall be responsible only for such claims which are incurred after the Closing. All such interests and encumbrances of any kind or nature whatsoever shall attach (effective upon the transfer of the Property to the Purchaser) to the proceeds of the Sale with the same force, validity, priority and effect, if any, as the claims, liens, encumbrances, and interests formerly had against the Property, if any, subject to the Debtor's right to challenge the extent, validity, priority and effect of the interests and subject to and as otherwise provided in any other order of this Court in this Chapter 11 Case.

(C)     On the Closing Date, this Order shall be construed and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Property or a bill of sale transferring good and marketable title in such Property to the Purchaser.

(D)     All entities who presently are, or on the Closing Date may be, in possession of some or all of the Property hereby are directed to surrender possession of the Property to the Purchaser on the Closing Date.

(E)     Except as expressly permitted by the Agreement of Purchase and Sale or this Order , all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, products liability and other creditors, holding interests or encumbrances of any kind or nature whatsoever against or in the Debtors or the Property (whether legal or equitable, secured or unsecured, matured or un-matured, contingent or non-contingent, senior or subordinated now existing or hereinafter arising), arising under or out of, in connection with, or in any way relating to, the Debtor, the Property, or the transfer of the Property to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successor or assign, its property, or the Property, such persons' or entities' interest or encumbrances.

(F)     On the Closing Date of the Sale, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its interests and encumbrances in the Property, if any, as such interests and encumbrances may have been recorded or otherwise exist.

(G)     If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or interests in any of the Property does not deliver to the Debtor or the Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Property, the Debtor and/or the Purchaser hereby are authorized to execute and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Property.

(H)     Subject to the terms and conditions of this Order and the Agreement, the transfer of the Property to the Purchaser pursuant to the Agreement constitutes a legal, valid, and effective transfer of the Property, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Property free and clear of all interests and encumbrances of any kind or nature whatsoever.

1.2     Permitted Exceptions.

The Property shall be conveyed subject to the following matters (collectively the "Permitted Exceptions"):

(a)     those matters deemed to be Permitted Exceptions pursuant to Section 2.3 hereof;

(b)     building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property restrictive covenants, easements,;

(c)     real and personal property taxes for the year of Closing (as such term is defined in Section 5.1 hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing; and

1.3     Purchase Price.

The purchase price for the Property shall be Three Million Fifty Thousand and No/100 Dollars ($3,050,000.00) (the "Purchase Price").

1.4     Payment of Purchase Price.

The Purchase Price shall be payable by Purchaser to Seller in cash or immediately available funds at Closing.

1.5     Earnest Money.

Within three (3) days after the Effective Date, Purchaser shall deposit with Presidio Title (the "Title Company"), having its office at 7373 Broadway, Suite 105, San Antonio, Texas 78209 (Attn: David McAllister), the sum of (a) Fifty Thousand and No/100 Dollars ($50,000.00) in cash (the "Earnest Money") to be held by the Title Company as earnest money in accordance with the terms and provisions of this Agreement and (b) One Thousand and No/100 Dollars ($1,000.00) in cash (the "Inspection Period Fee"), which shall be held and disbursed by the Title Company in accordance with the terms this Section and Section 3.2 of this Agreement. The Title Company is hereby instructed to hold the Earnest Money, less the Independent Contract Consideration (as defined in Section 1.6 hereof) and the Inspection Period Fee in an interest bearing account. All interest accruing on the Earnest Money, less the Independent Contract Consideration, shall become a part thereof and shall be delivered to the party entitled to receive the Earnest Money. All interest accruing on the Inspection Period Fee shall become a part thereof and shall be delivered to the party entitled to receive the Inspection Period Fee. If Purchaser fails to deposit the Earnest Money or the Inspection Period Fee with the Title Company as provided for herein, this Agreement shall automatically terminate and neither party shall have any further rights, duties or obligations hereunder. If Purchaser terminates this Agreement pursuant to an express right granted to Purchaser pursuant to this Agreement, the Title Company shall and is hereby instructed to immediately return the Earnest Money, less the Independent Contract Consideration, to Purchaser.

-6-

1.6     Independent Contract Consideration.

Notwithstanding anything to the contrary contained in this Agreement, Fifty and No/100 Dollars ($50.00) of the Earnest Money (the "Independent Contract Consideration"), which amount Seller and Purchaser hereby acknowledge and agree has been bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement, shall be nonrefundable and shall be delivered to Seller by the Title Company promptly after the Title Company receives the Earnest Money. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided for herein, and is nonrefundable in all events. If Closing occurs, the Independent Contract Consideration shall be credited against the Purchase Price.

ARTICLE II
TITLE AND SURVEY

2.1     Commitment for Title Insurance.

Seller and Purchaser hereby instruct the Title Company to deliver to Purchaser, Seller and the Surveyor (as such term is defined in Section 2.2 hereof), within five (5) days after the Effective Date, a Commitment for Title Insurance (the "Title Commitment") covering the Property, showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance (the "Owner's Policy"), the Owner's Policy to be issued by an underwriter acceptable to Purchaser, on the standard form of policy prescribed by the Texas State Board of Insurance and in the full amount of the Purchase Price. Seller and Purchaser further instruct the Title Company to promptly deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B or C of the Title Commitment.

2.2     Survey.

Seller shall, within ten (10) days after the Effective Date, deliver to Purchaser and the Title Company a copy of the Seller's most recent survey of the Property. If the If the existing survey is not acceptable to the title company, Seller, at Seller's expense, will obtain a new or updated survey acceptable to the title company and deliver the acceptable survey to Purchaser and the title company within 20 days after Seller receives notice that the existing survey is not acceptable to the title company. The closing date will be extended daily up to 20 days if necessary for Seller to deliver an acceptable survey within the time required. Purchaser will reimburse Seller $1,500.00 of the cost of the new or updated survey at closing, if closing occurs. Unless otherwise agreed by Seller and Purchaser, the metes and bounds description contained in the Survey shall be the legal description contained in the documents employed to convey the Property from Seller to Purchaser.

2.3     Title Review Period.

Purchaser shall have fifteen (15) days (the "Title Review Period") after the receipt of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment and the Survey to provide Seller with written notice (the "Title Objection Letter")

of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "Title Objections"). Except as set forth below, any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have ten (10) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "Cure Period"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and shall cause the Title Company to deliver to Purchaser a revised Title Commitment or Survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (a) mortgage liens, (b) security interests, (c) tax liens, (d) abstracts of judgment, (e) environmental liens, and (f) materialmen's and mechanic's liens (collectively "Liens"). Promptly after the expiration of the Cure Period, Seller shall provide Purchaser with written notice (the "Title Response Letter") setting forth those Title Objections which Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within five (5) days after Purchaser's receipt of the Title Response Letter, either terminate this Agreement by written notice to Seller, in which event the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to send written notice of the election available to it pursuant to the preceding sentence within five (5) days after Purchaser's receipt of the Title Response Letter shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall have no effect on Seller's obligation to cure or remove all Liens.

2.4     Owner's Policy.

At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (a) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (b) the exception for rights of parties in possession shall be deleted, (c) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable) and for "rollback" taxes that arise as a result of Purchaser's change in use of the Property, (d) all arbitration provisions shall be deleted, (e) all matters set forth on Schedule C of the Title Commitment shall be deleted, and (f) if requested by Purchaser, the "survey exception" shall be modified to read "shortages in area," in which event Purchaser shall pay all fees and additional premiums charged by the Title Company in connection with such modification.

ARTICLE III
INSPECTION PERIOD

3.1     Delivery of Materials.

Within five (5) days after the Effective Date, Seller, at its sole cost and expense and to the extent that it has any of the following in its possession or control, shall deliver to Purchaser the following (collectively the "Due Diligence Materials"):

(a)     statements of property taxes and assessed values with respect to the Property for 2015 and for 2016 and any and all tax documentation related to any agricultural property tax exemptions in existence with respect to the Property as a result of any agricultural leases covering the Property;

(b)     copies of any inspection reports relating to the Property in Seller's possession or control, including, without limitation, any environmental inspection reports and any inspection reports from the Franchisor;

(c)     copies of any inspection reports, correspondence or other documentation concerning the compliance of the Property with applicable rules, regulations, ordinances and laws of all governmental authorities having jurisdiction, including, without limitation, any inspection reports, correspondence or documentation concerning the Property's compliance or noncompliance, as the case may be, with the Americans with Disabilities Act of 1990 (the "ADA");

(d)     copies of any reports and correspondence relating to the availability of utilities and/or utility capacity, including, without limitation, water, sewer, gas, electricity, and surface water detention, at or near the Property;

(e)     copies of any Leases affecting the Property, which shall be subject to Purchaser's review and approval during the Inspection Period; and

(f)     such additional information relating to the Property in the possession or control of Seller as Purchaser may reasonably request.

To the best of Seller's actual knowledge, without additional inquiry, Seller represents and warrants that all materials, data and information to be delivered by Seller to Purchaser in connection with the transaction contemplated hereby will be complete, true and accurate in all material respects.

3.2     Right of Inspection

Purchaser shall have the right, for a period commencing on the Effective Date, and terminating thirty seven (37) days after the entry of the Order by the Court Approving the Sale to Purchaser (the "Inspection Period"), to enter the Property and make a physical inspection of the Property (including, without limitation, the taking of core samples and other intrusive testing) and to examine all books and records maintained by Seller relating to the Property at such place or places as such books and records may be located in Bexar County, Texas; provided, however,

-9-

that Purchaser agrees to (a) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense resulting from the negligence or willful misconduct of Purchaser, its agents, employees or contractors during such inspection and examination, and (b) repair any and all physical damage done to the Property by Purchaser, its agents, employees or contractors during such inspection and examination. All inspections shall be conducted so as not to unreasonably interfere with use of the Property by Seller. Purchaser and Seller acknowledge and agree that, in addition to the Earnest Money, Purchaser has deposited the Inspection Period Fee with the Title Company as provided in Section 1.5 of this Agreement as additional consideration to Seller for the Inspection Period provided herein. Purchaser and Seller further acknowledge and agree that (a) if Purchaser exercises its right to terminate this Agreement pursuant to Purchaser's right of termination set forth in Section 3.4 of this Agreement, then the Title Company shall deliver the Inspection Period Fee to Seller upon such termination of this Agreement, (b) in all other events in which Purchaser is entitled to terminate this Agreement, including, without limitation, in the event of Seller's default hereunder, the Inspection Period Fee shall be returned to Purchaser in the same manner in which the Earnest Money, less the Independent Contract Consideration, is returned to Purchaser in such events, (c) in all events in which Seller is entitled to terminate this Agreement, the Inspection Period Fee shall be delivered to Seller in the same manner in which the Earnest Money is delivered to Seller in such events, and (d) if this Agreement proceeds to Closing, the Inspection Period Fee shall be applied to the Purchase Price.

Purchaser will, at its sole cost and expense, within seven (7) calendar days after the entry of the Order Approving the Sale to Purchaser, make application for and obtain approval during the Inspection Period, to operate the property as an Econolodge hotel pursuant to an agreement with CHOICE HOTELS INTERNATIONAL ("Franchisor") thereof ("Franchise Approval"). Purchaser shall use its good faith efforts to obtain franchise approval and will at all times keep Seller appraised of its efforts to obtain franchise approval and respond promptly to all inquiries of Seller in this regard, supplying such information as Seller may reasonably request. Purchaser hereby agrees to diligently and timely execute all documents and pay all transfer fees and expenses required in connection with obtaining franchise approval and the continued operation of the Property as contemplated thereby pursuant to a franchise agreement with standards and provisions as are customary for franchise transfer of an Econonlodge hotel, which may be more or less favorable to Purchaser than the Franchise Agreement is with respect to the Seller. Seller agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining franchise approval. If Purchaser does not obtain franchise approval or disapproves the terms that will be imposed by Franchisor during the Inspection Period, this contract is considered null and void, and the Earnest Money less the non-refundable portion of the Earnest Money, the Inspection Period Fee and Independent Contract Consideration will be returned to the Purchaser by the Title Company.

3.3     Continuing Right of Inspection.

After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation taking of soil samples, ground water samples and other intrusive testing, so long as Purchaser (a) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents,

employees or contractors during such inspection and examination, and (b) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

3.4     Rights of Termination.

(a)     Seller agrees that if Purchaser determines that the Property is not suitable for its purposes for any reason or for no reason at all, Purchaser shall have the absolute and unconditional right to terminate this Agreement by sending written notice thereof (a "Notice of Termination") to Seller prior to the expiration of the Inspection Period. Upon receipt by Seller of a Notice of Termination within the Inspection Period, this Agreement shall terminate, in which event neither party shall have any further rights, duties or obligations hereunder and the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser and the Inspection Period Fee shall be immediately delivered to Seller. If Seller does not receive a Notice of Termination prior to the expiration of the Inspection Period, Purchaser's right to terminate this Agreement pursuant to this Section 3.4 shall automatically expire and be rendered null and void.

On or before the end of the Inspection Period, Purchaser shall notify Seller in writing which service contracts (which are cancelable and subject to termination without cost or early termination fee) Purchaser does not desire to assume on the Closing Date. Purchaser may elect to cancel service contracts so long as cancellation fees due under the terms of the service contracts for early termination, if any, are paid by and the responsibility of the Purchaser. All other service contracts that Purchaser does not affirmatively decline to assume in its notice shall be assumed by Purchaser as of the Closing Date. Seller shall deliver the Property to Purchaser at Closing free of any management agreements, contracts, or fees; and all existing managements agreements shall be terminated by Seller prior to Closing at no expense to Purchaser. Prior to Closing, Seller shall (i) timely notify the vendors of the pending assignment, and of any contracts to be assumed thereby, and (ii) cause all such contracts which will not be assumed by Purchaser to be terminated as of the Closing Date. Notwithstanding anything set forth herein to the contrary, all management agreements shall be terminated by Seller at or before Closing at no cost or expense to Purchaser. The foregoing termination shall be self-operative and no additional notice shall be required with respect to the foregoing.

(b)     Seller agrees that if, on or before December 10th, 2016, the Court fails to approve the Application and the sale of the Property to Purchaser and/or fails to approve all provisions of Section 1.1(b) of this Agreement with respect to Purchaser, Purchaser shall have the absolute and unconditional right thereafter to terminate this Agreement by sending a Notice of Termination to Seller. Upon receipt by Seller of a Notice of Termination as a result of the foregoing, this Agreement shall terminate, in which event neither party shall have any further rights, duties or obligations hereunder and (i) the Inspection Period Fee and (ii) the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser.

-11-

## ARTICLE IV
## CONDITIONS PRECEDENT

4.1     Conditions Precedent to Seller's Obligations.

It shall be an express condition precedent to Seller's obligations under this Agreement that as of the date of Closing the following conditions have been satisfied or waived in writing by Seller, with any waiver to be effective only if the same is executed by an authorized officer of Seller, expressly waives a particular condition and expressly refers to this Section 4.1:

(a)     All representations and warranties made by Purchaser pursuant to this Agreement shall be true and correct in all material respects; and

(b)     All covenants and other obligations of Purchaser set forth in this Agreement which if not fully and timely performed would have a material adverse effect on Seller's rights under this Agreement shall have been fully and timely performed in all material respects.

If the above described conditions are not fully satisfied or waived by Seller in the manner specified above as of the date of Closing, Seller shall have the right, but not the obligation, to terminate this Agreement in which event neither party shall have any further rights, duties or obligations hereunder and the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser; provided, however, that nothing contained in this Section 4.1 is intended to be or shall be construed as a limitation of any remedies available to Seller pursuant to Section 7.1 hereof if Purchaser defaults under this Agreement.

4.2     Conditions Precedent to Purchaser's Obligations.

It shall be an express condition precedent to Purchaser's obligations under this Agreement that as of the date of Closing the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition and expressly refers to this Section 4.2:

(a)     All representations and warranties made by Seller pursuant to this Agreement shall be true and correct in all material respects;

(b)     All covenants and other obligations of Seller set forth in this Agreement which have not fully and timely been performed would have a material adverse effect on Purchaser's rights under this Agreement shall have been fully and timely performed in all material respects;

(c)     Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 6.2(a) hereof;

(d)     The Court shall have entered its order approving the sale to Purchaser with such order containing the provisions outlined in Section 1.1(b)(iii); and

*Nextstep Development, Inc.*

(e)     From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the date of Closing, Purchaser shall have the right, but not the obligation, to terminate this Agreement in which event neither party shall have any further rights, duties or obligations hereunder and the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser; provided, however, that nothing contained in this Section 4.2 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 7.2 hereof if Seller defaults under this Agreement.

ARTICLE V
CLOSING

5.1     Time and Place.

The closing of the transaction contemplated hereby (the "Closing") shall take place at the offices of the Title Company on or before the thirtieth (30th) day following the expiration of the Inspection Period (or the nearest business day thereafter if such thirtieth (30th) day is on a Saturday, Sunday or legal holiday in Bexar County, Texas) or on such other date and at such time as may be agreed upon in writing by Seller and Purchaser. Buyer may obtain One (1), Thirty Day (30) day extension of Closing by depositing an additional deposit ("Extension Fee") of Fifteen Thousand Dollars ($15,000.00) to the Title Company for the Extension Fee . In addition to the Earnest Money, such Extension Fee is non-refundable and shall, without any further consent from Buyer, be payable and immediately transferred to the Seller upon Seller's instruction to the Title Company. However, the Extension Fee and Earnest Money will be credited to the Buyer upon Closing

5.2     Seller's Obligations at Closing.   At Closing, Seller shall:

(a)     deliver to Purchaser a Special Warranty Deed (the "Deed") in the form of Exhibit B attached hereto and made a part hereof for all purposes, executed and acknowledged by Seller and in recordable form, conveying the Property to Purchaser on an "AS IS, WHERE IS" basis (subject to Seller's representations, warranties and covenants that survive Closing), free and clear of all encumbrances except the Permitted Exceptions; provided, however, if Purchaser elects to finance a portion of the Purchase Price with a third party lender, the Deed shall be revised to include a vendor's lien, if required by such third party lender;

(b)     join with Purchaser in the execution and acknowledgement of any notice required by Section 50.301 of the Texas Water Code;

(c)     deliver to Purchaser a FIRPTA Affidavit (the "FIRPTA Affidavit") in the form of Exhibit C attached hereto and made a part hereof for all purposes, duly executed by Seller, stating that Seller is not a "foreign person" as defined in the federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act, and if Seller is unable or unwilling to deliver the FIRPTA Affidavit, in lieu thereof the funds payable

-13-

to Seller shall be adjusted in such a manner as to comply with the withholding provisions of such statutes;

    (d)    cause the Title Company to deliver the Owner's Policy to Purchaser in the form required by Section 2.4 hereof;

    (e)    deliver to Purchaser possession and occupancy of the Property, subject to the Permitted Exceptions;

    (f)    deliver to Purchaser tax certificates furnished by the taxing authorities having jurisdiction over the Property indicating that all property taxes on the Property have been paid through 2016;

    (g)    file or cause to be filed, in a timely manner, all reports or returns required by Section 6045(e) of the Internal Revenue Code of 1986, as amended (the "Code");

    (h)    deliver to Purchaser: (i) a bill of sale for the Personal Property, Permits and Intangible Property and (ii) an assignment of the Leases and Service Contracts in form and content reasonably acceptable to Seller conveying all of Seller's right, title and interest in such assets; and

    (i)    deliver to Purchaser such evidence as Purchaser and/or the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller.

5.3    <u>Purchaser's Obligations at Closing. At Closing, Purchaser shall:</u>

    (a)    pay to Seller the Purchase Price in cash or readily available funds, it being agreed that the Earnest Money, less the Independent Contract Consideration, shall be delivered to Seller at Closing and applied towards payment of such amount, that the Inspection Period Fee shall be delivered to Seller at Closing and applied towards payment of such amount, and that the Independent Contract Consideration shall be credited towards payment of such amount;

    (b)    join with Seller in execution of the instruments described in Section 5.2(b);

    (c)    pay for any Mortgagee Policy of Title Insurance (the "<u>Mortgagee Policy</u>") if required by any third party lender financing all or a portion of the Purchase Price; provided, however, Purchaser shall request the simultaneous issuance of the Mortgagee Policy with the Owner's Policy and Purchaser shall only be required to pay the simultaneous issuance fee described in Rate Rule R-5 or any successor or substitute rule or regulation promulgated by the Texas State Board of Insurance; and

    (d)    deliver to Seller such evidence as Seller and/or the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser.

-14-

5.4    Prorations.

(a)    Real property and personal property taxes for the year of Closing shall be prorated, as of the date of Closing, with any apportionment of real property taxes to be made with respect to a tax year for which either the tax rate or assessed valuation or both have not yet been fixed, to be upon the basis of the tax rate and/or assessed valuation last fixed; provided that Seller and Purchaser agree that to the extent the actual taxes for the current year differ from the amount so apportioned at Closing, Seller and Purchaser will make all necessary adjustments by appropriate payments between themselves following Closing. Seller shall pay at Closing any taxes and assessments assessed or to be assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership by Seller.  All such apportionments shall be subject to post-Closing adjustments as necessary to reflect later relevant information not available at Closing and to correct any errors made at Closing with respect to such apportionments and the party receiving more than it was entitled to hereunder shall reimburse the other party hereto in the amount of such overpayment within thirty (30) days after written demand therefor.  Notwithstanding the foregoing, such apportionments shall be deemed final and not subject to further post-Closing adjustments if no such adjustments have been requested after a period of ninety (90) days from such time as all necessary information is available to make a complete and accurate determination of such apportionments. and

(b) All utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs shall be prorated to the Closing Date. If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of a reasonable estimate by Seller and Purchaser of such utilities and other operating expenses for such month. Subsequent to the Closing, when the actual amount of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

(c) If the Closing shall occur before rents and all other amounts payable by the tenants or users under the Leases and all other income from the Property have actually been paid for the month in which the Closing occurs, the apportionment of such rents and other amounts and other income shall be upon the basis of such rents, other amounts and other income actually received by Seller. Subsequent to the Closing, if any rents and other income are actually received by Purchaser for periods prior to the Closing, all such amounts shall first be applied to post-closing rents due to Purchaser and the balance shall be immediately paid by Purchaser to Seller. Purchaser shall make a good faith effort and attempt to collect any such rents and other amounts and other income not apportioned at the Closing for the benefit of Seller; provided, however, that Purchaser shall not be required to expend any funds or institute any litigation in its collection efforts. Nothing in this paragraph shall restrict Seller's right to collect delinquent rents directly from a tenant or user by any legal means, excepting eviction proceedings.

Purchaser shall indemnify, protect, defend and hold Seller harmless from and against any and all claims by and liabilities to any third persons for the amount of the deposits or fees for which Purchaser obtains a credit as provided in this paragraph or which Purchaser receives directly from Seller. The agreements of Seller and Purchaser set forth in this paragraph shall survive the Closing.

(d) Closing Adjustments. Unless otherwise provided herein, the following items shall be adjusted between Seller and Purchaser as of 12:01 a.m. on the Closing Date:

(1) Purchaser shall be credited with any deposits from tenants or guests of the hotel (including interest earned thereon to the extent payable to such tenants or guests) in Seller's possession which are refundable to such tenants or guests.

(2) Net guest room revenue of the hotel, whether in cash or in accounts receivable, arising from occupancy for the night beginning on the day preceding the Closing Date and ending on the Closing Date shall be credited to Seller.

(3) All other ordinary and customary items of income and expense including, without limitation, room rents receivable from current guests of the Property as set forth in the guest ledger for periods prior to the night preceding the Closing Date, water, sewer, electricity and gas charges, real estate taxes and assessments, personal property taxes, items of expense under maintenance contracts, service contracts, personal property leases, rental contracts or equipment or telephone contracts, advertising contracts, cleaning contracts, prepaid rents and deposits for reservations shall be prorated or adjusted as of the Closing Date (to the extent possible with cut off bills as of 12:01 a.m. on the Closing Date, or to such time and date as near as possible thereto). All such items attributable to the period prior to the Closing Date shall be credited to and/or paid by the Seller, and all such items attributable to the period on and after the Closing Date shall be credited to and/or paid by the Purchaser. With respect to employee wages (i) Executive Housekeeper and Housekeepers will be paid by Seller until they punch out on the day prior to the Closing Date, (ii) General Manager, Assistant Manager, Front Office Manager, Guest Service Agents, Executive Housekeeper, Night Auditor, and maintenance personnel will be paid by Seller up to 8:00 a.m. on the Closing Date.

(4) In addition to the Purchase Price, Seller shall be paid the full amount of all cash on hand at the Hotel, including, without limitation, vending machine receipts relating to the Hotel in existence as of 12:01 a.m. on the Closing Date.

(5) All Accounts receivable shall belong to the Seller, and Seller may take action to collect same. In the event Purchaser receives payment on account of an

-16-

account receivable attributable to a date prior to the Closing Date, Purchaser shall immediately remit same to Seller.

The provisions of this paragraph 5.4 may not specify all adjustments properly to be made in a transaction of this nature. Representatives of Seller and Purchaser shall perform all of the adjustments through the Closing Date and any and all other adjustments not specifically referred to herein, which are appropriate and usual. The adjustments hereunder shall be calculated or paid in an amount based upon a fair and reasonable estimated accounting performed and agreed to by representatives of Seller and Purchaser at the Closing. Subsequent final adjustments and payments shall be made in cash or other immediately available funds as soon as practicable after the Closing Date, and in any event within ninety (90) days after the Closing Date, based upon an agreed accounting performed by representatives of Seller and Purchaser. The provisions of this Section 5.4 shall survive Closing.

5.5     Closing Costs.

Seller shall pay (a) the fees of any counsel representing Seller in connection with the transaction contemplated hereby, (b) the premium for the Owner's Policy (specifically excluding the fees and additional premiums charged by the Title Company in connection with the modification of the "survey exception" and the Title Policy Endorsements), (c) the cost of the Survey, (d) the fees for recording the Deed and any other instruments used to convey the Property to Purchaser, (e) Seller's Broker's Commission (as such terms are defined in Section 9.1 hereof), and (f) one-half (1/2) of any escrow fees charged by the Title Company in connection with the transaction contemplated hereby.  Purchaser shall pay (a) the fees of any counsel representing Purchaser in connection with the transaction contemplated hereby, (b) the simultaneous issuance fee if a Mortgage Policy is requested by any third party lender financing all or a portion of the Purchase Price, (c) the additional premium charged by the Title Company in connection with the modification of the "survey exception" in the Owner's Policy, if such modification is requested by Purchaser, and (d) one-half (1/2) of any escrow fees charged by the Title Company in connection with the transaction contemplated hereby.  All other costs and expenses incurred in connection with the transaction contemplated hereby shall be paid by the party incurring the same.

ARTICLE VI
REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1     Representations and Warranties of Seller.

Seller hereby represents and warrants to Purchaser that:

(a)     Seller is a corporation, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, all other agreements to be executed and delivered by Seller pursuant to the terms and provisions hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

-17-

(b)     This Agreement has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Agreement and all other agreements contemplated hereby shall, upon Bankruptcy Court approval, constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c)     The execution, delivery and performance of this Agreement and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d)     Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and Purchaser has any material rights in or to occupy all or any part of the Property. As of the Effective Date, no party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property; however, Purchaser acknowledges that, as a result of the pending Bankruptcy Case, other parties have the right to offer to purchase the Property under the Sales Procedure Order;

(e)     Except as provided in Section 1.1(b) of this Agreement, there are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(f)     Seller has no information of and to the best of Seller's actual knowledge, without additional inquiry, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any action by adjacent landowners, (iv) any natural or artificial conditions on or about the Property, or (v) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

-18-

(g)  To the best of Seller's actual knowledge, without additional inquiry, the property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(h)  To the best of Seller's actual knowledge, without additional inquiry, no Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property.  As used in this Agreement, the term "Hazardous Substances" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("EPCRA"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "Environmental Laws");

-19-

(i)     The Property has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by a municipality, county and/or the State of Texas;

(j)     To the best of Seller's actual knowledge, without additional inquiry, any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(k)     To the best of Seller's actual knowledge, without additional inquiry, the Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously been conveyed or transferred by Seller;

(l)     The Property complies in all respects with the rules, regulations, ordinances and laws of all governmental authorities having jurisdiction;

(m)     Seller is not in default under any of the agricultural leases covering the Property, and there is no event or fact which upon the passage of time or the giving of notice, or both, would constitute a default by Seller under any of the agricultural leases covering the Property;

(n)     To the best of Seller's actual knowledge, without additional inquiry, the Due Diligence Materials are true, accurate and complete in all material respects.

(o)     Except as otherwise identified on Exhibit D attached hereto, Seller owns all furniture, fixtures, equipment, machinery, signage, and other tangible assets and inventory used in connection with the operation of the hotel at the Property.

(p)     Exhibit E identifies all Leases and Service Contracts applicable to the Property. There is no machinery or equipment used in connection with the operation of the hotel at the Property which is subject to a lease agreement.

All references in this Section 6.1 or elsewhere in this Agreement to "Seller's knowledge" or "Seller's actual knowledge" or the "best of Seller's knowledge" (i) shall refer solely to the actual knowledge (as opposed to constructive, deemed or imputed knowledge) of Niraj Patel, (ii) shall not be construed to refer to the knowledge of any other employee, officer, director, shareholder or agent of Seller or any affiliate of Seller, (iii) shall not impose upon the foregoing individual(s) any duty to investigate the matter to which the actual knowledge, or the absence thereof, pertains and (iv) shall not impose any personal liability upon such person for the inaccuracy of such representation or warranty. Seller represents and warrants to Purchaser that Niraj Patel is the only employee, officer, director, shareholder or agent of Seller or any affiliate of Seller that possesses any material knowledge regarding the Property. Notwithstanding anything in this Agreement to the contrary, in the event that any of the Seller's representations or warranties in this Agreement becomes untrue or materially inaccurate between the Effective Date and the date of Closing, except as a result of Seller's intentional or willful action, Seller shall promptly notify

-20-

Purchaser of same before Closing, whereupon Purchaser shall as its sole and exclusive alternative remedies have the right to either (i) terminate this Agreement within five (5) days of receipt of such fact by giving written notice of termination to Seller within said period, whereupon the Inspection Period Fee and the Earnest Money, less the Independent Contract Consideration, shall be promptly returned to Purchaser and the parties shall have no further obligations hereunder other than the obligations that expressly survive the termination of this Agreement, (ii) waive any claim or cause of action relating to such fact and proceed to Closing or (iii) extend the Closing for a period of time not to exceed ten (10) days in order that Seller may attempt to cure the default. Purchaser shall not have the right to make a claim under any particular representation or warranty of Seller to the extent that, prior to Closing, Purchaser becomes aware that the representation or warranty is not accurate and elects to proceed to close.

The representations and warranties contained in this Section 6.1 shall be deemed to be restated at Closing and shall survive Closing.

6.2    Covenants of Seller.

Seller hereby covenants with Purchaser, which covenants shall survive Closing, as follows:

(a)    on or before the tenth (10th) day of each calendar month prior to Closing, Seller shall deliver to Purchaser any new or updated Due Diligence Materials in Seller's possession or control;

(b)    subsequent to the Effective Date, Seller will not, unless otherwise ordered by the Bankruptcy Court or without the prior written consent of Purchaser, enter into any lease, license, employment agreement, management agreement, agreement of purchase and sale, earnest money contract, option agreement, right of first refusal, letter of intent or other agreement affecting the Property or otherwise market the Property for sale (or permit Seller's affiliates or Seller's Broker or Seller's Broker's affiliates to market the Property for sale) to any other person or entity;

(c)    subsequent to the Effective Date, Seller will (i) maintain and operate the Property in a good and businesslike manner and the same manner as Seller has previously maintained and operated the same, and (ii) not commit or permit to be committed any waste to the Property;

(d)    Prior to Closing, Seller shall, at its sole cost and expense, terminate all contracts and agreements relating to the upkeep, repair, maintenance or operation of the Property and pay all accrued obligations arising out of the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(e)    Prior to Closing, Seller shall, at its sole cost and expense, terminate any and all leases covering any party of the Property (expressly excepting the Approved Agricultural Leases, which Seller shall maintain in effect through Closing), including, without limitation, written and/or oral residential leases covering any part of the Property and remove from the Property all property of any such residential or other tenants that may be kept, stored or otherwise located on the Property (expressly excepting any such

-21-

property kept, stored or located on the Property pursuant to the Approved Agricultural Leases).  Seller shall provide Purchaser on or before Closing documentation reasonably satisfactory to Purchaser evidencing the termination of such leases, including, without limitation, written termination agreements between Seller and any such tenants;

(f)     Prior to Closing, Seller shall, at no out-of-pocket expense to Seller, reasonably cooperate with Purchaser to comply with any and all applicable subdivision regulations and similar ordinances necessary to allow for the conveyance of the Property from Seller to Purchaser; and

(g)     Seller shall notify Purchaser immediately after the same occurs of any material change concerning the Property, these representations and warranties contained in Section 6.1 hereof, or any other information heretofore or hereafter furnished to Purchaser concerning the Property.

6.3     Representations and Warranties of Purchaser.

Purchaser hereby represents and warrants to Seller that:

(a)     Purchaser has complete power and authority to enter into this Agreement and all other agreements to be executed and delivered by Purchaser pursuant to the terms and provisions hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b)     This Agreement has been duly executed and delivered by Purchaser.  All other agreements contemplated hereby to be executed and delivered by Purchaser will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Purchaser.  This Agreement and all other agreements contemplated hereby constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms; and

(c)     The execution, delivery and performance of this Agreement and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Purchaser is a party, (ii) conflict with or violate the organizational documents of Purchaser, or (iii) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Purchaser.

The representations and warranties contained in this Section 6.3 shall be deemed to be restated at Closing and shall survive Closing.

6.4     Disclaimers.

PURCHASER AGREES THAT PURCHASER IS PURCHASING THE PROPERTY WITHOUT RECOURSE (EVEN AS TO THE RETURN OF THE PURCHASE PRICE), REPRESENTATION OR WARRANTY (EXCEPT AS TO THE SPECIAL WARRANTY OF

-22-

TITLE CONTAINED IN THE DEED AND WARRANTIES IN THE BILL OF SALE, AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT) OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY AND SELLER IS SELLING THE PROPERTY AS IS, WHERE IS, AND WITH ALL FAULTS, AND WITHOUT REPRESENTATIONS OR WARRANTY (ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT AS TO THE WARRANTIES, COVENANTS AND REPRESENTATIONS EXPRESSLY MADE IN THE DEED AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT) AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, LAYOUT, FOOTAGE, PHYSICAL CONDITION, OPERATION, COMPLIANCE WITH SPECIFICATIONS, ABSENCE OF LATENT DEFECTS, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY AND THE ENVIRONMENT) OR ANY OTHER MATTER AFFECTING OR RELATED TO THE PROPERTY.

PURCHASER ACKNOWLEDGES THAT SELLER HAS (EXCEPT AS TO THE WARRANTIES, COVENANTS AND REPRESENTATIONS EXPRESSLY MADE IN THE DEED AND BILL OF SALE, AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT) NOT MADE AND SPECIFICALLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES AS TO WATER, SOIL OR GEOLOGY OF THE PROPERTY AND AS TO INCOME TO BE DERIVED FROM THE PROPERTY. WITHOUT LIMITING THE FOREGOING (EXCEPT AS TO THE WARRANTIES, COVENANTS AND REPRESENTATIONS EXPRESSLY MADE IN THE DEED AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT), SELLER DOES NOT AND HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING THE PRESENCE OR ABSENCE OF ANY HAZARDOUS SUBSTANCES (AS DEFINED IN SECTION 6.1(H) OF THE AGREEMENT) ON, UNDER OR ABOUT THE PROPERTY OR THE COMPLIANCE OR NONCOMPLIANCE OF THE PROPERTY WITH ANY ENVIRONMENTAL LAWS (AS DEFINED IN SECTION 6.1(H) OF THE AGREEMENT).

PURCHASER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS TO THE WARRANTIES, COVENANTS AND REPRESENTATIONS EXPRESSLY MADE IN THE DEED AND BILL OF SALE, AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT, PURCHASER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PROPERTY BY PURCHASER IN DETERMINING WHETHER TO PURCHASE THE PROPERTY. THE PURCHASE PRICE IS A NEGOTIATED PURCHASE PRICE REPRESENTING THE FACT THAT THE PROPERTY IS BEING PURCHASED BY PURCHASER ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, EXCEPT AS TO THE WARRANTIES, COVENANTS AND REPRESENTATIONS EXPRESSLY

MADE IN THE DEED AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT.

PURCHASER HEREBY WAIVES AND RELINQUISHES ALL RIGHTS AND PRIVILEGES ARISING OUT OF, OR WITH RESPECT, OR IN RELATION TO, ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, WHICH MAY HAVE BEEN MADE OR GIVEN, OR WHICH MAY BE DEEMED TO HAVE BEEN MADE OR GIVEN, BY SELLER, OTHER THAN THE SPECIAL WARRANTIES IN THE DEED AND THOSE EXPRESS WARRANTIES, COVENANTS AND REPRESENTATIONS OF SELLER THAT SURVIVE CLOSING AND THAT ARE CONTAINED IN THIS AGREEMENT. SELLER SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO IN THIS AGREEMENT OR IN THE DEED. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT THE PROPERTY IS SOLD BY SELLER SUBJECT TO THE FOREGOING PROVISIONS OF THIS SECTION 6.4.

THE PROVISIONS OF THIS SECTION 6.4 SHALL BE DEEMED RESTATED AT AND SHALL SURVIVE CLOSING.

ARTICLE VII

DEFAULT

7.1     Default by Purchaser.

If Purchaser fails to consummate this Agreement for any reason, except Seller's default or the termination of this Agreement by either Seller or Purchaser as expressly provided for herein, Seller shall be entitled, as its sole and exclusive remedy terminate this Agreement and receive the Earnest Money, as liquidated damages for the breach of this Agreement. Seller and Purchaser stipulate and agree that the damages to Seller if Purchaser defaults under this Agreement are difficult or impossible to accurately estimate and the amount of the Earnest Money is a reasonable forecast of just compensation for the harm that would be caused to Seller upon Purchaser's default.

7.2     Default by Seller.

If Seller fails to consummate this Agreement for any reason, except Purchaser's default, the Bankruptcy Court's failure to approve the Sale or the termination of this Agreement by either Seller or Purchaser as expressly provided for herein, Purchaser shall be entitled, as its sole and exclusive remedies, subject to Section 1.1(b) of this Agreement, to either (a) seek to enforce specific performance of this Agreement, or (b) the return of the Inspection Period Fee and the Earnest Money, less the Independent Contract Consideration, which return shall operate to terminate this Agreement. Seller and Purchaser stipulate and agree that the damages to Purchaser if Seller defaults under this Agreement are difficult or impossible to accurately

-24-

estimate and the amount of the Earnest Money is a reasonable forecast of just compensation for the harm that would be caused to Purchaser upon Seller's default.

## ARTICLE VIII
## CONDEMNATION

8.1   Condemnation.

If any condemnation or written threat of condemnation occurs with respect to all or any part of the Property prior to Closing, Purchaser may, at its sole option, either terminate this Agreement, whereupon the Earnest Money, less the Independent Contract Consideration, shall be immediately returned to Purchaser, or Purchaser may elect to consummate the transaction contemplated hereby, in which event Seller's right to all condemnation proceeds and other sums resulting from such condemnation shall be assigned in writing by Seller to Purchaser and delivered to Purchaser, after which Seller shall have no further obligation to Purchaser with regard to such condemnation.

## ARTICLE IX
## COMMISSIONS

9.1 Commissions.

Seller agrees to pay to Marcus & Millichap ("Seller's Broker") a commission if the transaction contemplated hereby is consummated, but not otherwise.  Such commission shall be in the amount of three percent (3%) of the Purchase Price ("Seller's Broker's Commission"). Each party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent other than Seller's Broker engaged in connection with the transaction contemplated hereby and each party agrees that should any claim be made for brokerage commissions or finder's fees by any broker, finder or agent (other than Purchaser's Broker and Seller's Broker) by, through or on account of any acts of the indemnifying party or its agents, employees or representatives, the indemnifying party will hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this Section 9.1 shall survive Closing.

## ARTICLE X
## MISCELLANEOUS

10.1   Assignment.

Purchaser may assign or transfer its rights and obligations under this Agreement at any time to any wholly owned, controlled or affiliated entity or party without the consent of Seller, and this Agreement shall inure to the benefit of and be binding on the parties hereto and their respective heirs, legal representatives, successors, and assigns.  Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned.  If Purchaser assigns its rights and obligations under this Agreement to a wholly owned, controlled or affiliated entity or party who fully assumes Purchaser's obligations and

liabilities under this Agreement, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

10.2    Discharge of Obligations.

The acceptance of the Deed, bill of sale and Lease and Service Contracts assignment by Purchaser at Closing shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions hereof, except those, if any, which pursuant to the express provisions of this Agreement survive Closing. The acceptance of the Purchase Price by Seller at Closing shall be deemed to be full performance and discharge of every agreement and obligation on the part of Purchaser to be performed pursuant to the provisions hereof, except those, if any, which pursuant to the express provisions of this Agreement survive Closing.

10.3    Expiration of Time Periods.

If any time period set forth in this Agreement ends or expires on a Saturday, Sunday or legal holiday in Bexar County, Texas, such time period shall end or expire on the nearest business day thereafter. Time periods set forth in this Agreement shall be calculated using calendar days unless business days are expressly provided for.

10.4    Title Policy or Abstract.

The Texas Real Estate License Act requires written notice to Purchaser that it should have an attorney examine an abstract of title to the property being purchased or obtain a title insurance policy. Notice to that effect is hereby given to Purchaser.

10.5    Notices.

Any notice pursuant hereto shall be given in writing by (a) personal delivery, or (b) expedited delivery service with proof of delivery, or (c) United States Mail, postage prepaid, certified mail, return receipt requested, or (d) prepaid facsimile transmission (provided that such facsimile transmission is confirmed by expedited delivery service or by mail in the manner previously described), sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of email or facsimile transmission, upon receipt. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant hereto shall be as follows:

(i)     If to Seller:

Nextstep Development Inc.
12010 Lamar Bridge
San Antonio, Texas 78249

-26-

Attention: Niraj Patel, President
Email:neilpateltx@gmail.com

with a copy thereof to:

Law Offices of William B. Kingman, P.C.
4040 Broadway, Suite 350
San Antonio, Texas 78209
William B. Kingman
Email address: bkingman@kingmanlaw.com

(ii)    If to Purchaser:

Paresh A. Patel & Nima P. Patel
1822 Washington Way
Longview, WA 98632
Email: Townchalet@netzero.net

with a copy thereof to:

Robert Pazouki
Pazouki & Arambula, LLP
17115 San Pedro Ave., Suite 330
San Antonio, TX 78232
Email: rp@pazoukilaw.com

10.6    Disbursements.

All disbursements of every kind made in connection with the transaction contemplated hereby shall be made at Closing by the Title Company and all such disbursements and their respective recipients shall be clearly set forth on the applicable settlement statement.

10.7    Modification.

This Agreement cannot under any circumstance be modified orally, and no agreement shall be effective to waive, change, modify or discharge this Agreement in whole or in part unless such agreement is in writing and is signed by both Seller and Purchaser.

10.8    Confidentiality.

Purchaser recognizes, understands and agrees that pursuant hereto it will become aware of certain information regarding the ownership and operation of the Property, including, specifically, without limitation, the Due Diligence Materials. Purchaser agrees that, except in connection with the Bankruptcy Case, a proceeding before a court of competent jurisdiction or other governmental or quasi-governmental body, it shall not disclose any such information to any third party or parties, except to agents, employees or independent contractors advising or assisting Purchaser with the transaction contemplated hereby, potential or actual investors,

-27-

potential and actual lenders of all or a portion of the Purchase Price, regulators and rating agencies and as otherwise expressly allowed pursuant to the terms and provisions of this Agreement. Seller agrees that, except in connection with the Bankruptcy Case, a proceeding before a court of competent jurisdiction or other governmental or quasi-governmental body, it shall not disclose to any third party or parties the existence of this Agreement or the identity of Purchaser prior to Closing, except as expressly allowed pursuant to the terms and provisions of this Agreement. Seller agrees that it will not disseminate any press releases, media releases or other public announcements concerning the transaction contemplated by this Agreement either prior to or subsequent to Closing. The provisions of this Section 10.8 shall survive Closing.

10.9    Reporting Requirements.

The Title Company hereby agrees to serve as the real estate reporting person as that term is defined in Section 6045(e) of the Code. This Agreement shall constitute a designation agreement, the name and address of the transferor and transferee of the transaction contemplated hereby appear in Section 10.5 hereof and Purchaser and the Title Company each agrees to retain a copy of this Agreement for a period of four (4) years following the end of the calendar year in which Closing occurs. The provisions of this Section 10.9 shall survive Closing.

10.10    Time is of the Essence.

Seller and Purchaser agree that time is of the essence with regard to this Agreement.

10.11    Successors and Assigns.

The terms and provisions of this Agreement are to apply to and bind the successors and assigns of the parties hereto.

10.12    Exhibits and Schedules.

The following schedules or exhibits attached hereto (collectively the "Exhibits") shall be deemed to be an integral part of this Agreement:

        (a)    Exhibit A--legal description of the Real Property;

        (b)    Exhibit B--form of Deed; and

        (c)    Exhibit C--form of FIRPTA Affidavit.

        (d)    Exhibit D – List of Non-Seller owned items at Property

        (e)    Exhibit E – List of existing leases and service contracts

10.13    Entire Agreement.

This Agreement, including the Exhibits, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction.

-28-

10.14   Further Assurances.

Both Seller and Purchaser agree that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the transaction contemplated hereby.  The provisions of this Section 10.14 shall survive Closing.

10.15   Fees and Expenses.

If any controversy, claim or dispute between Seller and Purchaser affecting or relating to the subject matter or performance of the rights, duties and obligations under this Agreement, the prevailing party shall be entitled to recover from the nonprevailing party all of the prevailing party's reasonable expenses, including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest.

10.16   Counterparts.

This Agreement may be executed in multiple counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one (1) such counterpart in proving the existence, validity or content of this Agreement.

10.17   Severability.

If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

10.18   Section Headings.

Section headings contained herein are for convenience only and shall not be considered in interpreting or construing this Agreement.

10.19   Binding Effect.

This Agreement shall not be binding upon any party hereto unless and until both Seller and Purchaser have executed this Agreement.

10.20   Choice of Law.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without regard to the conflicts of laws principles thereof.

10.21   Joint Drafting.

Seller and Purchaser hereby agree that this Agreement and the Exhibits have been jointly drafted, negotiated and agreed upon by Seller and Purchaser and that any rule of contract interpretation that provides that ambiguity will be construed against the drafting party is inapplicable to this Agreement and the Exhibits and shall not be used in connection with the interpretation of this Agreement or the Exhibits.

-29-

10.22   No Third Party Beneficiary.

The provisions hereof and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party.  No third party shall have the right to enforce the provisions hereof or of the documents to be executed and delivered at Closing.

10.23   Effective Date of Agreement.

Purchaser's offer to acquire the Property as evidenced by Purchaser's execution of this Agreement and delivery thereof to Seller shall become void and of no effect unless accepted by Seller as evidenced by Seller's execution of this Agreement and delivery thereof to the Title Company on or before the date that is three (3) days after the date Purchaser executes this Agreement.  The date of delivery of a fully executed counterpart of this Agreement by Seller and Purchaser to the Title Company (as evidenced by the Title Company's signature on the following page) shall be deemed the effective date of this Agreement (the "Effective Date").

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement effective as of the Effective Date.

SELLER:

Executed by Seller this 2ⁿᵈ day of DECEMBER, 2016.

NEXTSTEP DEVELOPMENT INC.,
a Texas corporation

By _____
Niraj Patel, President

PURCHASER:

Executed by Purchaser this 30ᵗʰ day of NOVEMBER, 2016.

_____
Paresh A. Patel

Executed by Purchaser this 30ᵗʰ day of NOVEMBER, 2016.

_____
Nima P. Patel

The Title Company hereby agrees to perform its obligations under this Agreement and acknowledges receipt of a fully executed counterpart of this Agreement from Seller and Purchaser on the 7 day of DECEMBER, 2016, which date shall be deemed the "Effective Date" of this Agreement.

TITLE COMPANY:

PRESIDIO TITLE

By _____
Name: DAVID A. McALLISTER
Title: PARTNER

31

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement effective as of the Effective Date.

SELLER:

Executed by Seller this
___ day of _____, 2016.

NEXTSTEP DEVELOPMENT INC.,
a Texas corporation

By_____
   Niraj Patel, President

PURCHASER:

Executed by Purchaser this
___ day of _____, 2016.

_____
Paresh A. Patel

Executed by Purchaser this
30th day of NOVEMBER, 2016.

_Nima P. Patel_

_____
Nima P. Patel

The Title Company hereby agrees to perform its obligations under this Agreement and acknowledges receipt of a fully executed counterpart of this Agreement from Seller and Purchaser on the _7th_ day of _DECEMBER_, 2016, which date shall be deemed the "Effective Date" of this Agreement.

TITLE COMPANY:

PRESIDIO TITLE

By _David A. McAllister_
Name: _DAVID A. McALLISTER_
Title: _PARTNER_

## EXHIBIT A

A 1.943 acre tract of land being all of Lot 43, New City Block 7902, Lounsberry Addition Subdivision, an addition to the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 9508, Page 114, Deed and Plat Records of Bexar County, Texas and a portion of Lot 12, New City Block 7902, Lounsberry Addition Subdivision, an addition to the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 105, Page 193, Deed and Plat Records of Bexar County, Texas and being more particularly described as follows:

BEGINNING at a found ½ inch iron rod located in the southerly line of Division Avenue and marking the northwesterly corner of Lot 43, same being the northeasterly corner of Lot 41, New City Block 7902, Lounsberry Addition Subdivision, City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 9300, Page 68, Deed and Plat Records of Bexar County, Texas;

THENCE along the southerly line of Division Avenue, the following courses:

North 87° 57' 48" East, a distance of 127.11 feet, to a found ½ inch iron rod marking the northwesterly corner of Lot 12;

North 89° 13' 57" East, a distance of 126.46 feet, to a found ½ inch iron rod marking the northeasterly corner of Lot 12, same being the northwesterly corner of Lot 11;

THENCE, South 00° 02' 04" West, leaving the southerly line of Division Avenue and along the westerly line of Lot 11, a distance of 335.41 feet, to a found ½ inch iron rod marking the southeasterly corner of Lot 12, same being the southwesterly corner of Lot 11;

THENCE, South 89° 10' 37" West, along the southerly line of Lot 12, a distance of 126.65 feet, to a found ½ inch iron rod marking the southeasterly corner of Lot 43;

THENCE North 89° 41' 02" West, a distance of 126.43 feet, to a found ½ inch iron rod marking the southwesterly corner of Lot 43, same being the southeasterly corner of Lot 42;

THENCE, North 00° 02' 17" West, along the easterly line of Lot 42 and Lot 41, a distance of 330.32 feet, to the POINT OF BEGINNING and containing 1.943 acres of land, more or less.

Basis of bearing is the westerly line of Lot 43, according to Volume 9508, Page 114.

*Nextstep Development, Inc.*

EXHIBIT B

## SPECIAL WARRANTY DEED

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER

| THE STATE OF TEXAS | § | |
|---|---|---|
| | § | KNOW ALL PERSONS BY THESE PRESENTS: |
| COUNTY OF BEXAR | § | |

THAT Nextstep Development Inc., a Texas corporation ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by _____, a _____ _____ ("Grantee"), whose mailing address is _____, the receipt and sufficiency of which consideration are hereby acknowledged, and upon and subject to the exceptions, encumbrances, terms and provisions hereinafter set forth and described, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY, unto Grantee that certain tract or parcel of real property situated in Bexar County, Texas, described on Exhibit A attached hereto and made a part hereof for all purposes, together with all and singular the rights, benefits, privileges, easements, tenements, hereditaments and appurtenances thereon or in anywise appertaining thereto, and together with all improvements situated thereon, all sewer and wastewater discharge capacity allocated or reserved thereto, all potable water capacity allocated or reserved thereto, all other utility rights allocated or reserved thereto, all development rights with respect thereto, any right, title and interest of Grantor in and to adjacent streets, alleys, rights-of-way and any adjacent strips or gores of real estate and any right, title and interest of Grantor in and to all rights, royalties and profits in connection with all minerals, oil and gas and other hydrocarbon substances on or in the Property (such land, rights, benefits, privileges, easements, tenements, hereditaments, appurtenances, improvements and interests being hereinafter referred to collectively as the "Property").

This conveyance is expressly made subject and subordinate to those encumbrances and exceptions (collectively the "Permitted Exceptions") set forth on Exhibit B attached hereto and made a part hereof for all purposes, but only to the extent that the same are valid and subsisting and affect or relate to the Property.

TO HAVE AND TO HOLD the Property, subject to the Permitted Exceptions, as aforesaid, unto Grantee, its successors and assigns, forever; and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Grantor, but not otherwise.

-33-

GRANTEE, BY ACCEPTANCE OF THIS SPECIAL WARRANTY DEED (THIS "DEED"), ACKNOWLEDGES THAT IT HAS INSPECTED AND ASSESSED THE PROPERTY AND HAS SATISFIED ITSELF AS TO THE CONDITION OF SAME AND THAT IT ACCEPTS THE PROPERTY "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESSED, IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WITHOUT IMPLIED WARRANTY AS TO HABITABILITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FITNESS FOR ANY PURPOSE, SAVE AND EXCEPT THE WARRANTIES OF TITLE CONTAINED HEREIN.

By accepting this Deed, Grantee has agreed that and understands that Grantor shall not be responsible or liable to Grantee for any defects, errors, omissions, or on account of any other conditions affecting the Property, and because Grantee is purchasing the Property "AS IS, WHERE IS, and WITH ALL FAULTS," Grantee hereby fully, irrevocably and unconditionally releases and discharges the Grantor and, as applicable, its respective officers, directors, partners, trustees, agents, attorneys, employees and representatives (collectively, the "Grantor Parties") from, and Grantee hereby waives and relinquishes any claims that Grantee may ever have against the Grantor and Grantor Parties for, any cost, loss, liability, damage, and expense arising out of or related to any alleged representations or warranties, whether express or implied, which may have been made or given, or which may be deemed to have been given by Grantor Parties (Grantor having specifically disclaimed having made any such representations or warranties), or any defects or other conditions affecting the Property, subject to the terms of this Deed and the covenants, representations and warranties contained in the Purchase Agreement that expressly survive closing under the Purchase Agreement. THE RELEASE AND WAIVER CONTAINED IN THIS PARAGRAPH SHALL APPLY AND BE ENFORCEABLE AS A DEFENSE AGAINST ANY CLAIMS MADE BY GRANTEE (OR GRANTEE'S SUCCESSORS AND ASSIGNS), EXCEPT AS PROVIDED IN THIS DEED and such release and waiver shall be given full force and effect according to each of its express terms and provisions, whether the causes of action are in tort or breach of contract, choate or inchoate, or relating to unknown and suspected claims, damages or losses.

Grantor warrants payment of all property taxes on the Property through and including the year 2016. By acceptance of this Deed, Grantee assumes payment of all property taxes on the Property for the year 2017, which have been prorated, and subsequent years, but not subsequent taxes and assessments by authority for the current year or prior years due to change in land use or ownership by Grantor, which shall be paid by Grantor.

IN WITNESS WHEREOF, this Deed has been executed by Grantor on the date of the acknowledgement set forth below, to be effective for all purposes as of the __ day of _____, 2016.

NEXTSTEP DEVELOPMENT INC.,
a Texas corporation

By_____
    Niraj Patel, President


THE STATE OF _____     §
                               §
COUNTY OF _____     §

This instrument was acknowledged before me on the ____ day of _____, 2016, by Niraj Patel, in his capacity as President of Nextstep Development Inc., a Texas corporation, on behalf of the corporation.


_____
Notary Public in and for the
State of Texas

EXHIBIT A TO SPECIAL WARRANTY DEED

(INSERT PROPERTY DESCRIPTION)

-36-

<u>EXHIBIT B TO SPECIAL WARRANTY DEED</u>

**PERMITTED EXCEPTIONS**

1.    Outstanding ad valorem taxes for tax year 2017

*Nextstep Development, Inc.*

EXHIBIT C
FIRPTA AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____ _____ ("Transferee"), whose mailing address is _____, that withholding of tax is not required upon the disposition of a U.S. real property interest by Nextstep Development Inc., a Texas corporation ("Transferor"), the undersigned hereby certifies as follows:

1.   Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and the regulations promulgated thereunder);

2.   Transferor's U.S. employer identification number is _____;

3.   Transferor is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii); and

4.   Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document.

EXECUTED effective as of the ___ day of _____, 2016.

NEXTSTEP DEVELOPMENT INC.,
a Texas corporation

By_____
     Niraj Patel, President

SWORN TO AND SUBSCRIBED BEFORE ME this ___ day of _____, 2016.

_____
Notary Public in and for
the State of Texas

-38-

<u>EXHIBIT D</u>
<u>LIST OF NON-SELLER OWNED ITEMS AT PROPERTY</u>

1. 2 Beverage Vending Machines

2. 1 Food/Candy Vending Machine

3. 3 Coin Operated Washing Machines

4. 3 Coin Operated Dryers

5. Cable Boxes

6. HSPI Connection Boxes

7. T1 Server Box

*Nextstep Development, Inc.*

<u>EXHIBIT E</u>
<u>LIST OF LEASES AND SERVICE CONTRACTS</u>

1. Service Contract with Time Warner Cable

2. Service Contract with Logix Communications

3. Service Contract with Genesis Merchant Solutions

4. Service Contract with Shift 4

5. Contract with Choice Hotels International

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

This First Amendment to Agreement of Purchase and Sale ("Amendment") is made and entered into by and between Nextstep Development, Inc., a Texas corporation ("Seller") and Paresh A. Patel and Nima P. Patel and/or its permitted assigns (collectively, "Purchaser").

For and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Purchaser hereby recite and agree as follows:

1.   **Recitals.**

(a)   **Agreement of Purchase and Sale.**   Seller and Purchaser entered into an Agreement of Purchase and Sale dated effective December 8th, 2016 (the "Contract"), pursuant to which Seller agreed to sell and Purchaser agreed to purchase, pursuant to the terms, provisions and conditions therein, that certain real property in the City of San Antonio, County of Bexar, State of Texas, being more particularly described in the Contract. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Contract.

(b)   **Amendment.**   Seller and Purchaser desire to amend the Contract pursuant to this Amendment as hereinafter provided.

2.   **Amendment to Purchase Price.** Seller and Purchaser hereby agree that paragraph 1.3 of the Contract is hereby deleted in its entirety and replaced with the following::

"1.3 Purchase Price

The purchase price for the Property shall be Three Million One Hundred Fifty Thousand and No/100 Dollars ($3,150,000.00) (the "Purchase Price")."

3. **Amendment to Provisions Relating to Inspection Period** Seller and Purchaser hereby agree that paragraph 3.2 of the Contract is hereby deleted in its entirety and replaced with the following paragraph

"**3.2**    Right of Inspection

Purchaser shall have the right, for a period commencing on the Effective Date, and terminating on February 03, 2017 (the "Inspection Period"), to enter the Property and make a physical inspection of the Property (including, without limitation, the taking of core samples and other intrusive testing) and to examine all books and records maintained by Seller relating to the Property at such place or places as such books and records may be located in Bexar County, Texas; provided, however, that Purchaser agrees to (a) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense resulting from the negligence or willful misconduct of Purchaser, its agents, employees or contractors during such inspection and examination, and (b) repair any and all physical damage done to the Property by Purchaser, its agents, employees or contractors during such inspection and examination. All inspections shall be conducted so as not to unreasonably interfere with use of the Property by Seller. Purchaser and Seller acknowledge and agree that, in addition to the Earnest Money, Purchaser has deposited the Inspection Period Fee with the Title Company as provided in Section 1.5 of this Agreement as additional consideration to Seller for the Inspection Period provided herein.

1

Purchaser and Seller further acknowledge and agree that (a) if Purchaser exercises its right to terminate this Agreement pursuant to Purchaser's right of termination set forth in Section 3.4 of this Agreement, then the Title Company shall deliver the Inspection Period Fee to Seller upon such termination of this Agreement, (b) in all other events in which Purchaser is entitled to terminate this Agreement, including, without limitation, in the event of Seller's default hereunder, the Inspection Period Fee shall be returned to Purchaser in the same manner in which the Earnest Money, less the Independent Contract Consideration, is returned to Purchaser in such events, (c) in all events in which Seller is entitled to terminate this Agreement, the Inspection Period Fee shall be delivered to Seller in the same manner in which the Earnest Money is delivered to Seller in such events, and (d) if this Agreement proceeds to Closing, the Inspection Period Fee shall be applied to the Purchase Price.

Purchaser will, at its sole cost and expense, on or before December 24, 2016, make application for and obtain approval during the Inspection Period, to operate the property as an Econolodge hotel pursuant to an agreement with CHOICE HOTELS INTERNATIONAL ("Franchisor") thereof ("Franchise Approval"). Purchaser shall use its good faith efforts to obtain franchise approval and will at all times keep Seller appraised of its efforts to obtain franchise approval and respond promptly to all inquiries of Seller in this regard, supplying such information as Seller may reasonably request. Purchaser hereby agrees to diligently and timely execute all documents and pay all transfer fees and expenses required in connection with obtaining franchise approval and the continued operation of the Property as contemplated thereby pursuant to a franchise agreement with standards and provisions as are customary for franchise transfer of an Econonlodge hotel, which may be more or less favorable to Purchaser than the Franchise Agreement is with respect to the Seller. Seller agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining franchise approval. If Purchaser does not obtain franchise approval or disapproves the terms that will be imposed by Franchisor during the Inspection Period, this contract is considered null and void, and the Earnest Money less the non-refundable portion of the Earnest Money, the Inspection Period Fee and Independent Contract Consideration will be returned to the Purchaser by the Title Company."

    4.    **Closing**. The Closing shall take place on or before February 15, 2017; provided that Buyer shall retain the right to extend the closing for 30 days by paying the Extension Fee as provided in Section 5.1 of the Contract

    5.    **Other Terms**. All other terms, conditions and provisions of the Contract are hereby ratified and confirmed and shall remain in full force and effect as of the date thereof, except as expressly modified hereby.

    6.    **Counterparts**. This Amendment may be executed by facsimile transmission in two or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

    7.    **Binding Effect**. This Amendment shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

*[Signature Page Follows]*

_16th._

EXECUTED to be effective on December ~~15,~~ 2016(the "Effective Date of this Amendment").

**SELLER:**

SELLER:

Executed by Seller this
20 day of JANUARY 2017.

NEXTSTEP DEVELOPMENT INC.,
a Texas corporation

By _____
Niraj Patel, President

**PURCHASER:**

Executed by Purchaser this
27 day of January, 2017.

_Paresh Patel_
Paresh A. Patel

Executed by Purchaser this
27 day of January 2017.

_Nima Patel_
Nima P. Patel

3